## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ILIRJAN SHEMA,

    **Defendant.**

CRIMINAL ACTION FILE

NO. 1:21-cr-0297-SDG-AJB

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court is Defendant Ilirjan Shema's motion to suppress statements. [Doc. 26]. The Court held an evidentiary hearing, [Doc. 36 (hereinafter "T__")], after which the parties filed briefs. [Docs. 37 (Govt.), 38 (Def.), 40 (govt.)]. For the following reasons, the undersigned **RECOMMENDS** that the motion be **DENIED**.

## I.    BACKGROUND

Shema is charged by way of an indictment with three charges related to an alleged assault against his wife, A.S., at a place within the Special Maritime and Territorial Jurisdiction of the United States, that is a residence in the Republic of Moldova used by personnel assigned to the United State Embassy in the Republic of Moldova, in violation of 18 U.S.C. §§ 7(9), 113(a)(4), 113 (a)(8), and 2261(a)(1).

[Doc. 1].  He contends that statements he made to law enforcement officers at his home on April 10, 2021, at a hotel in Chisinau, Moldova on April 11, 2021, via videoconferencing on April 14, 2021, and his arrest on August 5, 2021, should be suppressed from his trial.  [Doc. 26]; T7-8.

The Court finds the following facts from the testimony and exhibits received during the evidentiary hearing.   On April 10, 2021, Joshua John Peterson was the Regional Security Officer in the Diplomatic Security Service ("DSS"), the law enforcement arm of the U.S. Department of State, and was assigned to the U.S. Embassy in Chisinau, Moldova.   T9.[1]   His job duties included (1) being the Ambassador's chief advisor for law enforcement security, (2) responsibility for the safety and security of those persons under the Ambassador's authority, as well as their dependents, (3) keeping the embassy safe, (4) acting as the liaison with local law enforcement, and (5) conducting investigations, both administrative and criminal.  T10.  He also supervised approximately 95 people, including local guards, bodyguards, surveillance detection assistants, office management assistants, another special agent, a residential security coordinator, and a detachment of Marines, but only the human resources office had authority to terminate his

---

[1]     At the time of the hearing, Peterson had worked for the DSS for 13 years. T9.

2

supervisees.  T11-12.  In more serious criminal cases, such as assaults on officers and their dependents, Peterson would not act as the lead case agent, but rather would gather information at the direction of an agent from DSS's Office of Special Investigations ("OSI").  T11.

On April 10, 2021, Peterson supervised Shema, who was the residential security coordinator.[2]  T12.  He had met Shema in July 2020 when Peterson arrived at post, and had a friendly work relationship with him.  T38.  He interacted with him several times a week.  T12.  Shema's residential security coordinator job was characterized as an "eligible family member position" since Shema's spouse, A.S., was a foreign service officer at the U.S. Embassy.  T13.  The position required fluency in English and at least a high school degree, and Shema passed a test in his English aptitude abilities.  T13-14, 43 (discussing whether Level 3 (working level fluency to have conversations and attend meetings) or Level 4 proficiency was necessary for the position).  However, Shema's native language was Albanian and English was his second language.  T42.  Although Peterson tried to have some

---

[2]    The residential security coordinator was responsible for insuring that the embassy residences inhabited by embassy officers and their families met the Department of State's security standards with regard to alarms and issues associated with them.  T12, 44.  The position was not considered a law enforcement or security guard job, although it required a criminal history check.  T45.

conversations in Albanian with Shema, Peterson tested only at a 2+ level and did not engage in any work conversations with him in Albanian.  T64.  Shema spoke English at work and communicated in writing, including via email, in English.  T64. Although Shema grew up in Albania, A.S. grew up in in the State of Georgia.  T65. Peterson observed Shema and A.S. speaking with each other only in English.  T65.

On April 10, Peterson was having dinner at a neighbor's house when A.S. appeared at the door.  She appeared very distraught, stressed and nervous, and was not wearing shoes although it was chilly outside.  T15.  She advised Peterson that her husband Shema, whom she called Lili, hit her and attacked her.  T15-16.  She denied needing medical attention.  T16.  Peterson asked A.S. where her children were and she stated that they were still at the residence and she was concerned for their safety.  T16, 65-66.  Peterson advised A.S. to stay at the neighbor's residence. He began making arrangements through the embassy for a hotel room for A.S. or Shema to stay that night due to the apparent domestic dispute situation, and called his deputy, Special Agent Lucas Field, to meet him at Peterson's house.  T16, 47.

Peterson went to his home and grabbed his firearm, baton, flashlight, and handcuffs, just because of the inherent volatility of domestic disturbances and in the event his interaction with Shema became an altercation (Shema was larger than

4

Peterson).  The equipment was concealed under his clothing, and he was in plain clothes.  T18.  He waited outside Shema's residence, which was separated from Peterson's residence by another home.  T17-18, 46.  Each of the houses in the neighborhood was surrounded by a 10-foot wall, and Peterson waited inside the wall but outside of Shema's residence.  T18, 47.

There were two doors to the Shema residence, a vehicle door that was closed and a pedestrian door that Peterson observed was wide open.  The family dog was in the street.  Because the front door was open, Peterson could see into the house.  T18-19.  He saw Shema talking on the phone in a loud voice and walking inside the house in the atrium and going up the stairs.  T19, 48.  He also saw the children in the very back of the house, separated from Shema.  At that point the children did not appear to be in danger.  T49.

After Lucas arrived, they decided to enter the house out of concern for the children's safety.  T19, 48.  Peterson was able to see the children in a room in the rear of the house from his vantage point before he entered the residence, but they had retreated into the family room before the agents entered.  T50.  At the threshold, Peterson announced, "Lili, we are coming in."  T19, 49.  He heard a monosyllabic reply from Shema "that indicated that he had heard me," and Peterson and Field

entered the atrium.  T19, 50.[3]  Peterson saw Shema on the stairs, pacing while he was on his cell phone.  T50.  Peterson asked, "Lili, what's going on?" and Shema launched into what Peterson described as a running monologue that was not interrupted even when Peterson and Lucas told him to take a breath and calm down. T20.  "What's going on?" was the only question Peterson asked.   T67.  Shema stated that he suspected A.S. of having an affair and had been disrespectful to him in the bedroom while talking on the phone.  He said he grabbed her by the neck in a choking manner threw her to the floor.  He said he knew he had done something wrong and was willing to accept the consequences.  T20-21.  Peterson described Shema as very agitated, very loud, and still pretty angry.  T21.

After the agents entered and Shema was talking, the children emerged from the room and Peterson directed them to go the neighbor's house where A.S. was and they walked out the door.  The children appeared scared.  T22, 51.  Only a couple of minutes had elapsed since Peterson and Field entered the residence.  T51.

---

[3]     Peterson later in his testimony described Shema's monosyllabic response as follows:

> Kind of like - - I don't want to mimic, because I can't.  that wouldn't come over well, but kind of like an okay just without the *K* on it.  Like *Ah*.  Something he heard me speak, and it wasn't a *no* or anything of that nature.

T50 (emphasis in original).

However, even though the children were now out of the house, Peterson had heard what A.S. had said and wanted to hear Shema's perspective.  T51.

During this encounter, Shema was neither under arrest nor detained, and he was not prevented from leaving.  The agents' firearms and batons remained hidden. T22.  He was not told that there would be adverse employment consequences.  T23. Peterson explained to Shema that it was a good idea to have him and A.S. spend the night apart, and rather than have the children stay at a hotel with A.S., for Shema to go the hotel and he agreed to do that.  T52.  Peterson did not tell Shema that he had to leave the residence but instead advised him that they had arranged a hotel room for him at the Radisson and that he should grab an overnight bag, which he did, although he was escorted by Field while he did so.  T23, 52.  At some point after Peterson exited the residence to do other tasks, Shema was instructed to leave his diplomatic and personal passports at the residence.  T52-53, 62.  He also did not have his residence or car keys while at the hotel, although the record is not clear as to whether he was directed to leave them or not.  T53, 78.  His work cell phone was surrendered on the instructions of the Deputy Chief of Mission, but this occurred at some point after April 10.  T62, 69.  Shema still had his personal phone. T69, 78.  The Radisson is a ten-minute drive from the residence in no traffic.  T53-54.  He was told not to return to the house.  T54.

7

After leaving the Shema residence, Peterson contacted the OSI, who assigned Special Agent Kenneth Velez at the case agent.  T24.

Although still employed as the residential security officer, between April 10 and 14, 2021, Shema was on placed on paid administrative leave by the "family advocacy team," a three-person committee composed of Peterson, a medical officer, and the Deputy Chief of Mission, and so he was not allowed to go to the embassy. T24, 54-55.  The decision to place him on leave was made because in his role as residential security officer, Shema frequently was alone with embassy staff and their dependents in the staff members' homes and the committee was concerned that staff members would not feel comfortable with him in that situation given the allegations.  T25.  Shema was told he was on paid administrative leave, that he was not being charged vacation time, but that he should not come to work.  He was not told that he was going to lose his job.  T25.

On April 11, Peterson went to the Radisson with the embassy medical officer to perform a welfare check on Shema.  T25-26.  The Deputy Chief of Mission advised Peterson to retrieve Shema's passports from the residence.   T67-68. Although Peterson asked him no questions, Shema stated that A.S. appeared to be lighter than he expected when he picked her up the previous night, and implied that she recently lost some weight.  T26.

8

Peterson explained that while at the hotel, Shema was free to come and go as he pleased, and testified that he was observed at a pizzeria close to the hotel. T27. There were no guards posted at the hotel. T69-70. However, in order to leave Moldova, Shema would have had to ask for his passports. T57. During the interim between April 10 and 14, Peterson and Shema discussed his wanting to go to Albania, and his passports were returned to him. T56, 72.

Either on April 11 or 12, Velez told Peterson that he wanted to interview Shema. T27. Peterson worked on seeing if Shema was available as well as getting a video camera set up in an embassy conference room. T27. Peterson contacted Shema, most likely by telephone, and told him that if he wanted to tell his side of the story, there was an opportunity to do so, but if he did not want to, "that would be perfectly fine as well." T28, 58-59. Shema agreed and he seemed eager to Peterson to tell his side of the story. T28. This was not surprising to Peterson since Shema had on several occasions, including during the wellness check at the hotel and over the telephone, expressed his desire to explain the events of April 10 and what led up to them. T28-29. Peterson did not question Shema about the April 10 events during any of these interim encounters. T29. At no time between April 10 and the April 14 interview did Peterson state to Shema that there would be adverse consequences for his failing to participate in the April 14 interview; in fact, he told

9

them there would be no adverse consequences if he chose or did not chose to be interviewed.  T30.  However, when he stated on April 10 that he wanted to go to Albania, Peterson and Field advised him that that would be a bad idea.  T76.

Special Agent Field brought Shema to the embassy on April 14 for the interview.  T30, 59.  The April 14 interview was conducted in the basement conference room in the embassy compound.  T29-30.  The room, located next to Field's office, was small, with a table and three chairs on each side and one each at the head and foot.  T30.  Shema also was scheduled to get his Covid-19 vaccine at the embassy that day and did so before the interview.  T31.

When Shema arrived at the conference room, Peterson, following Velez's directions, told him that the interview was voluntary and he did not need to participate, he could leave after one question, it was entirely up to him, and that there would be no consequences regardless of his decision.  T32, 83.  He did not verbally tell him that that the part of the purpose of the interview was a criminal investigation or that what he stated could be used in a criminal investigation.  T59-60.  Shema appeared upbeat than in previous days and willing to tell his side.  T32.

Peterson and Field were in the interview room with Shema, but neither participated in the questioning.  T33.  The room was not locked.  T33. Velez and fellow Special Agent Natasha Diamond-Pate conducted the interview by

videoconference over Microsoft Teams from the United States.   T82.   The interview was recorded with Shema's consent.   T85; Govt. Ex. 1.   The interview was conducted in English.   T85.   Velez held his badge up to the camera, stated that Shema might not know what OSI did, and explained that OSI looked into incidents like that which occurred on April 10.   Govt. Ex. 1 (beginning at 00:32).   Shema acknowledged that he was there on his own accord and understood he could decline to answer any questions.   *Id.* at 01:28, 01:33-37.   Velez stated that they ask that everything Shema says be the truth, which Shema also acknowledged.   *Id.* at 01:42-50.   Velez then advised that Peterson "has the standard form . . . that basically summarizes what it just said and . . . if you could just review and sign it, that would be great, before we continue."   *Id.* (beginning at 1:56).   Peterson provided Shema with a form, and stated "read it for a second then . . . everything they just told you is exactly what this says."   *Id.* at 02:08-16.   Shema did not appear to read the form, and asked instead where he should sign because "I don't want to mess it up."   *Id.* The form provided as follows:

> WARNING AND ASSURANCE TO EMPLOYEE REQUESTED
> TO PROVIDE INFORMATION ON A VOLUNTARY BASIS
>
> You are being asked to provide information in an investigation.   This investigation is being conducted pursuant to the Omnibus Diplomatic Security and Antiterrorism Act of 1986, as amended (22 U.S.C. 4801, *et seq).*

Inquiry pertains to: *Incident at House*

This is a voluntary interview.  Accordingly you do not have to answer questions or make a statement.  If you decide to answer questions or make a statement, you may stop answering or discontinue the statement at any time.  No disciplinary action will be taken against you solely because you choose not to answer questions.  You have the right to have a representative present during all interviews concerning this matter.

Any statement you furnish may be used as evidence against you in any future criminal proceeding, agency disciplinary proceeding, or both.  Additionally, the information solicited may be used to determine suitability for assignment to certain sensitive positions and/or geographic areas; or to determine suitability for continued employment or eligibility for access to classified information.

If you knowingly and willfully provide false statements or information in your answers, you may be criminally prosecuted for that action under 18 U.S.C 1001.

Govt. Ex. 2.  Under the heading "WAIVER," the form provided:

I understand the warnings and assurances stated above and I am willing to answer questions and/or make a statement.  No promise or threats have been made to me and no pressure or coercion of any kind has been used against me.

I hereby solemnly swear or affirm that the statements provided in this interview are the truth and nothing but the truth.

*Id.*  Shema immediately signed the form without barely looking at it and printed his name, and Peterson and Field signed as witnesses.  *Id.*; *see also* T32-36, 61, Govt. Ex. 1 at 02:16.

12

Velez then told Shema that the session was voluntary, that his "job here really is to just be fair and objective . . . understand from your perspective what happened.  Okay, so I make no judgments.  I'm just here to listen to your side of the story.  *Id.* (beginning at 02:39).

During the interview, Shema explained the backstory about what happened between him and A.S. and what caused him to be angry that night.  T37.  He spoke fluent English.  *See* Govt. Ex. 1.  In short, he admitted to grabbing A.S. by the throat and throwing her to the ground.  *Id.* at 42:54.  He showed how his hands were placed around her neck.  *Id.* at 55:10.  He also acknowledged that he might be arrested.  *Id.* at 1:39 to 1:50:15.

When the interview was over, arrangements were made to get his transportation back to the Radisson Hotel (where he stated he was treated like a "superstar" (*id.* at 02:28), where he stayed while he continued to be employed by the embassy for several more days.  T37.  On either April 17 or 18, Shema left Moldova on his own volition and subsequently resigned his position as residential security coordinator.  T38.  Prior to that time, neither his credentials nor his access badge were taken away from him.  T75.

On August 5, 2021, Shema traveled to Atlanta via commercial airplane.  T87.  Arrangements were made to keep all of the other passengers on the plane as Shema

13

disembarked.  T97.  As he exited the aircraft, perhaps escorted by a flight attendant, he was met by Velez at the jetway, who advised him to place his case on the ground, face the wall of the jetway, and that he was under arrest for the assault on his wife in embassy housing.  Velez handcuffed him.  T87-88, 98.  Velez did not ask him any questions, but Shema asked what took him so long and stated that he would have come if he had just called or asked.  T87-88.  Velez was accompanied by two Customs and Border Protection ("CBP") officers but they asked him no questions.  T88.  A rudimentary search was conducted, resulting in the seizure of his wallet, passport, and cell phone.  T89.

Shema was taken to CBP's secondary inspection area about a 6- to 8-minute walk away, where a more thorough search was conducted.  T90, 98.  The handcuffs were removed and he was seated in a seat.  The room was 8 x 10 feet, with an office desk with two hairs on one side and one chair on the other.  The front wall was made of glass.  Shema's demeanor was neutral under the circumstances.  Velez read him *Miranda* warnings in English from a preprinted form, Govt. Ex. 3, which provided as follows:

U.S. Department of State
DIPLOMATIC SECURITY SERVICE

Advisement of Rights

Before I ask you any questions, I want to explain your rights to you.

14

- You have the right to remain silent.

- Anything you say can be used against you in a court of law.

- You have the right to consult with a lawyer before questioning and to have a lawyer present during questioning.

- If you cannot afford a lawyer, one will be appointed to represent you free of charge prior to any questioning.

Velez waited for Shema to acknowledge each right. T93, 94. Shema spoke English. T92. At one point Shema stated that he would have come if he had been asked. T94. Shema checked that he understood his rights and that he was willing to waive those rights and talk to Velez now without a lawyer being present. T95. The form was signed by Shema and witnessed by Velez and Diamond-Pate at 8:42 PM. T95-96. The CBP officers already had departed after Shema was searched. T90-91. Velez also provided him with a preprinted *Miranda* form in Albanian, which Velez did not read to him but which Shema signed and the agents witnessed. T92. Shema stated that he had nothing to hide, and repeated what took you so long and that he would have come if asked or called. T94-95. The record does not reveal the content of any additional questioning or statements by Shema.

## II.   **PARTIES' ARGUMENTS**

The government contends that Shema was not entitled to *Miranda* warnings on April 10 and 11 because he was not in custody. [Doc. 37 at 10]. It also contends

15

that all of the statements he made were voluntary.  [*Id.* at 10-13].  Specifically as to the April 10 statement, the government asserts that the statements that Shema made on April 10 were not involuntary on the grounds that Peterson and Field entered his house without a warrant.  It submits that no Fourth Amendment violation occurred because the warrantless entry was authorized by Shema' consent and the exigent circumstances.  It argues that he voluntarily consented because of his monosyllabic reply to Peterson's announcement that they were coming in, that sounded " 'kind of like and okay' " and " 'was not a no or anything of that nature,' " [*Id.* at 15 (citing T50)].  Alternatively, it argues that the warrantless entry was justified by exigent circumstances in that the agents had an objectively reasonable belief that the children in the residence could be in danger.  [*Id.* at 16-17].  The government further argues that even if the entry was unlawful, it did not taint Shema's April 10 statement because the purpose and flagrancy of the official misconduct weighs in its favor.  [*Id.* at 18].  Next, it contends that April 14 statement was voluntary in that there was no governmental action that overbore his will.  [*Id.* at 20].  To the extent that there was an inconsistency in Peterson's advice that there would be "no consequences" to his participation or lack of participation in the interview and the fact that his statements now are being used against him in a criminal proceeding, the government argues that it was clear from the context that

16

Peterson was referring to his employment situation.  [*Id.* at 22-24].  Furthermore, Shema signed a waiver form advising him that any statement could be used against him in any criminal proceeding, and talked about a potential arrest, indicating that he was aware of the potential criminal consequences.  [*Id.* at 22-23].  Moreover, the government argues that his statements were not compelled within the meaning of *Garrity v. New Jersey*, 385 U.S. 493 (1967).  [Doc. 37 at 25-26].  Finally, it contends that the August 5 statements were voluntary and that it complied with *Miranda*.  [*Id.* at 27-28].

Shema responds by first challenging the voluntariness of his April 14 statements.  He contends that the import of the verbal warnings repeatedly given to him by Peterson over the course of several days to the effect that there would be "no consequences" whether he talked to Velez or not, and that he "crossed the line" by telling Shema that there would be no consequences if he talked, since that told Shema that nothing he said would be used against him.  [Doc. 38 at 6-9].  He further argues that he was never told that his statements were being taken as part of a criminal investigation, that Velez was a criminal investigator (asserting that many federal employees who are not law enforcement officers have badges), and that he was misled about the contents of the waiver form which he signed.  [*Id.* at 9-14].

Shema next challenges his April 10 statements, arguing that they were tainted by the unlawful entry into his home.  He submits that his "monosyllabic reply" did not constitute voluntary consent but rather at most an acquiescence to a show of authority.  [*Id.* at 15-17].  Likewise, he contends that exigent circumstances did not exist justifying the warrantless entry, noting that Peterson did not make entry into the house to secure the children once he obtained his law enforcement gear, but instead made arrangements for Shema to go to a hotel, saw the children in the back of the house while Shema was talking on the phone, waited for Field to arrive, and even when they entered the home, did not go and "rescue" the children. [*Id.* at 17-18].

In reply, the government points out that Shema did not challenge either his April 11 or August 5 statements.  [Doc. 40 at 1-2].  It also reiterates that no Fourth Amendment violation occurred on April 10 and even if the entry was unlawful, Shema's statements were sufficiently attenuated to not be rendered involuntary. [*Id.* at 2-7].

As to the April 14 statement, the government argues that the totality of the circumstances show that Shema's statements were voluntarily obtained.  It distinguishes the case Shema primarily relies upon, *United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010), arguing that in that case the police told the suspect

that anything he said would not be used to prosecute him, [Doc. 40 at 8-9 (quoting *Lall*, 607 F.3d at 1287)], whereas here there was no explicit promise that Shema would not be prosecuted or charged with a crime, and Shema himself acknowledged that he might be charged. [*Id.* at 9]. Instead, it argues that other cases such as *Martin v. Wainwright*, 770 F.2d 918 (11th Cir. 1985), where the suspect was told that the truth would not hurt him, are more instructive. [Doc. 40 at 10]. It also argues that another case relied upon by Shema, *Hart v. Attorney General of State of Florida*, 323 F.3d 884 (11th Cir. 2003), is distinguishable because in that case, after the defendant signed the *Miranda* waiver, the police told him that honesty would not hurt him, which advice the Eleventh Circuit found deceptive and inconsistent with *Miranda*'s protections; whereas in the present case, Shema's boss told him that no consequences would attach to his decision to participate or not participate in the questioning before the questioning started. [Doc. 40 at 11]. It also claims that the statement was not rendered involuntary because Shema was not told that it was given in a criminal investigation, [*id.* at 11-12 (citing *United States v. Johnson*, 94 Fed. Appx. 964, 966 (3d Cir. Apr. 20, 2004) (statement not involuntary where defendant thought FBI interview was only for administrative purposes where encounter demonstrated defendant's understanding that he was subject to criminal investigation)], and, in any event, Shema

acknowledged that he was subject to potential criminal charges. [*Id.*]. Finally, the government argues that the waiver form signed by Shema is "strong proof" that he voluntarily waived his rights and the totality of circumstances demonstrates that he voluntarily participated in the interview. [*Id.* at 12].

## III. <u>DISCUSSION</u>

The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475. Even if *Miranda* warnings were not required, when given, the government must act consistently with its protections. *Lall*, 607 F.3d at 1285; *Tukes v. Dugger*, 911 F.2d 508, 516 n.11 (11th Cir. 1990).

Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983). The government must prove by a preponderance of the evidence that the defendant waived his rights knowingly and voluntarily. *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005). An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate choice,

rather than through intimidation, coercion or deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). Thus, a waiver is effective where the totality of the circumstances reveal both an uncoerced choice and the requisite level of comprehension. *United States v. Ransfer*, 749 F.3d 914, 935 (11th Cir. 2014) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also United States v. Wright*, 300 Fed. Appx. 627, 632 (11th Cir. Nov. 12, 2008) (citing *Barbour*, 70 F.3d at 585). "An express written or oral statement of waiver . . . is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Johnson*, 379 Fed. Appx. 964, 968 (11th Cir. May 24, 2010). A defendant need not, however, understand all the consequences of the waiver. He need only understand his right to remain silent or have his statements used against him. *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *see also United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990) (to determine whether a waiver was intelligent, the court should "inquire whether the defendant knew that he did not have to speak to police and understood that statements provided to police could

be used against him . . .   A suspect need not, however, understand the tactical advantage of remaining silent in order to effectuate a valid waiver.").

The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into waiving his rights:  "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."  *Connelly*, 479 U.S. at 170 (alteration and internal quotation marks omitted).  The Court should consider the totality of the circumstances in assessing whether any police conduct was "causally related" to the waiver. *See Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988).  This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's waiver was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  Among the factors the Court should consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009).  However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of

voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted).  Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.  *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).  Nonetheless, a waiver is not knowing and intelligent where the *Miranda* rights are contradicted by an interrogating officer.  *Lall*, 607 F.3d at 1283-84 (citing *Hart*, 323 F.3d at 895).

In addition, in any arrest or custodial situation there is present a degree of duress.  The question is whether the officers used coercive tactics or took unlawful advantage of the situation to obtain the defendant's waiver or statements.  *Cf. United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973)[4] (discussing consent to search following arrest).  Moreover, while a defendant's mental condition is a " 'significant factor' " in the " 'voluntariness calculus,' " *Miller*, 853 F.2d at 1536 (quoting *Connelly*, 479 U.S. at 520), even the interrogators' knowledge that a

---

[4]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

23

suspect may have mental problems does not make the suspect's statement involuntary unless " '[t]he police exploited this weakness *with coercive tactics*.' " *Miller*, 853 F.2d at 1357 (quoting *Connelly*, 479 U.S. at 521 (emphasis in *Miller*)).

Separate and apart from compliance with *Miranda*, the government also must establish that a defendant's statements were voluntary. *United States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements.   Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness."); *see also Jarrell v. Balkcom*, 735 F.2d 1242, 1252 & n.11 (11th Cir. 1984) (observing that although *Miranda* and *Jackson v. Denno*, 378 U.S. 368 (1964), protect Fifth Amendment rights, *Jackson* "raises an issue distinct from the *Miranda* question in determining a confession's admissibility and [t]hus, even if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness).

Voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver.   When deciding whether a confession was voluntary, courts consider the totality of the circumstances including (1) details of the interrogation; (2) the defendant's education, intelligence, and other characteristics; (3) length of detention; (4) questioning that is repetitious or prolonged; (5) physical punishment

24

such as the deprivation of food or sleep; and (6) any promises to induce a confession. *Ransfer*, 749 F.3d at 935; *see also Connelly*, 479 U.S. at 163 n.1; *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010); *Waldrop v. Jones*, 77 F.3d 1308, 1316 (11th Cir. 1996). Again, however, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *Castaneda-Castaneda*, 729 F.2d at 1362-63. Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

## A.    April 10 statements

The Court concludes that Shema's April 10 statements were voluntary because they were not tainted by Peterson and Field's unlawful entry into the

residence.  A warrantless entry into a home is unreasonable and, therefore, violates the Fourth Amendment, subject to two exceptions: consent and exigent circumstances. *McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007).

However, the Court disagrees with the government's contention that Shema's "monosyllabic reply" demonstrated voluntary consent to the agents' entry into his home.  It is "well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *United States v. Freyre-Lazaro*, 3 F.3d 1496, 1500-01 (11th Cir. 1993) (quoting *Schneckloth*, 412 U.S. at 219).  To be valid, however, consent must be the product of a free and voluntary choice rather than the result of mere "acquiescence to a claim of lawful authority." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).  "Whether an individual's consent to a warrantless search was given voluntarily is a question of fact that must be decided in light of the totality of the circumstances.  *Gonzalez*, 71 F.3d at 828 (citing *Schneckloth*, 412 U.S. at 227).  The government bears the burden of proving that the search was justified by consent. *Cf. Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021); *McClish*, 483 F.3d at 1241;  *Bashir v. Rockdale County*, 445 F.3d 1323, 1328 (11th Cir. 2006).

Most recently, the *Fuqua* court, in considering a warrantless entry into a commercial facility by a fire marshal, canvassed the Eleventh Circuit's consent-to-search-a-residence jurisprudence:

> [W]e have been reluctant to "sanction[ ] entry into the home based upon inferred consent." *Gonzalez*, 71 F.3d at 830 (quotation marks and citation omitted) (alterations in original).   We have therefore held that an officer does not obtain valid consent to search a home merely because the homeowner fails to verbally or physically object to his entering the home.  *See id.* at 829-30; *Bashir*, 445 F.3d at 1329.   In *Gonzalez*, for instance, we held that an officer did not have consent to enter a home when he merely followed the homeowner into her house after she said she needed to get a drink of water.  *Gonzalez*, 71 F.3d at 829-30.   Her failure to bar the officer's follow-on entry could not, we said, "be viewed as an adequate implied consent to that warrantless intrusion." *Id.* at 829.   Similarly, in *Bashir*, we held there was no implied consent when an officer followed Bashir into his home after he withdrew from a conversation with the officer to tend to his crying son.   445 F.3d at 1329.   Consent could not "reasonably be inferred," we said, "from Bashir's simple act of disengaging from conversation with [the officer] and walking into the house." *Id.*
>
> We have also held that no valid consent exists when an officer gains entry into the home by a show of force or "official authority." So, for instance, in *United States v. Edmondson*, 791 F.2d 1512, 1514-15 (11th Cir. 1986), we said Edmondson did not consent to an FBI agent entering his home to arrest him when, after hearing an agent yell "FBI. Open the Door," he opened the door, stepped back, and placed his hands on his head.   In determining that Edmondson did not voluntarily consent to the intrusion, we considered it important that Edmondson knew his apartment was surrounded by FBI agents.  *See Edmondson*, 791 F.2d at 1515.   We reaffirmed this principle in *McClish*, 483 F.3d at 1241, where an officer reached into McClish's home and pulled him out when he opened his door, and again in *Moore v. Pederson*, 806 F.3d 1036, 1044-46 (11th Cir. 2015), where an officer crossed the threshold of Moore's home to arrest him after Moore, in

submission to the officer's commands, turned around and put his hands behind his back. In both cases, we said the officers violated the Fourth Amendment by entering the homes without valid consent. *McClish*, 483 F.3d at 1241; *Moore*, 806 F.3d at 1046.

In a few cases, however, we have found that the totality of the circumstances supported a finding of voluntary consent to search a private dwelling. In *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002), we addressed whether Ramirez-Chilel consented to officers entering his home when, in response to their request for admittance to search the home for evidence of counterfeit immigration documents, he stepped aside from the threshold and let the officers inside. In holding that Ramirez-Chilel's consent was free and voluntary, we distinguished *Edmondson* and *Gonzalez*. *Ramirez-Chilel*, 289 F.3d at 751-52. *Edmondson* did not control, we said, because unlike in that case, the officers did not have their guns drawn and there were not "a large number of officers surrounding" Ramirez-Chilel's home. *Id.* at 751. As for *Gonzalez*, we noted there was a difference "between the failure to object when officers follow someone into their home and the act of 'yielding the right-of-way' to officers at the person's front door." *Id.* at 752. While Ramirez-Chilel did not give the officers "explicit verbal consent . . . to enter, the officers did receive some sort of implied consent to enter from Ramirez-Chilel's body language that was not present in *Gonzalez*." *Id.*

We also found voluntary consent for officers to search the defendant's residence in *United States v. Pineiro*, 389 F.3d 1359 (11th Cir. 2004). In that case, four FBI agents showed up to Pineiro's house, which they suspected was being used as a marijuana grow site. *Pineiro*, 389 F.3d at 1362. Pineiro was not home when the agents arrived, so the agents talked with Pineiro's parents and brother who lived across the street until Pineiro arrived. *Id.* Once Pineiro arrived, the agents identified themselves and told him they wanted to "look around" his house. *Id.* Pineiro agreed and accompanied the agents through the house as they conducted their search. *Id.* at 1363. In affirming the district court's conclusion that Pineiro gave his voluntary consent to the search, we noted four things: (1) the agents "identified themselves and explained the purposes of their search";

(2) none of the four agents who entered Pineiro's house had his gun drawn or visible; (3) Pineiro verbally consented to the search; and (4) Pineiro led the agents "on a tour of his home" and "cooperated with their search efforts . . . [by] moving his dog into the garage and then into the yard to enable the agents to enter." *Id.* at 1366.

Putting all this together, we have a fairly defined picture of when law enforcement officers have effective consent to search private residences for evidence of criminal activity. We know that the mere failure to object to an officer's entry into the home does not constitute valid consent to the entry, but that some affirmative indication, even if non-verbal, that the officers are welcome to enter may be enough. We also know that an officer cannot procure valid consent by force or intimidation, whether verbal or physical. Finally, we know what factors might tip the determination one way or the other: how many officers are present; whether the officers are armed, whether the arms are visible, and whether they are drawn; whether the agents explain the purpose of the search; and whether the homeowner actively aided the officers in searching his home.

*Fuqua*, 996 F.3d at 1151-53.

Applying these principles, several facts point to a finding that Shema did not consent to the agents' entry. First, Peterson, who clearly was acting in a law enforcement capacity, was also Shema's boss and neighbor. Peterson's announcement that "we're coming in" did not explain why they were entering and could not therefore be taken as Shema's consent to allow law enforcement to enter the home. Second, even Peterson to his credit did not embellish what Shema stated. The monosyllabic response was at most not an objection to the agents' entry but it certainly could not be viewed as an affirmative statement of agreement or consent.

29

Third, Peterson's announcement that "we're coming in" did not provide for any contrary response by Shema, and thus constitutes merely an acquiescence to authority.

On the other hand, the Court concludes that exigent circumstances justified the warrantless entry. Exigent circumstances constitute one exception to the warrant requirement. *Lange v. California*, 141 S. Ct. 2011, 2017 (2021). Exigent circumstances exist when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983). Recognized situations in which exigent circumstances exist include "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." *United States v. Blasco*, 702 F.2d 1315, 1325 (11th Cir. 1983). "One of the most clear-cut justifications for entry without a warrant is an emergency involving a 'need to protect or preserve life.' " *Smith v. LePage*, 834 F.3d 1285, 1292-93 (11th Cir. 2016) (quoting *United States v. Holloway*, 290 F.3d 1331, 1335 (11th Cir. 2002)); *see also Holloway*, 290 F.3d at 1337 ("[E]mergency situations involving endangerment to life fall squarely within the exigent circumstances exception.").

30

However, while "[c]ourts have catalogued several situations in which exigent circumstances exist, [ ] it is clear that the exception must be applied carefully to each factual scenario." *Blasco*, 702 F.3d at 1325; *accord Lange*, 141 S. Ct. at 2018 (explaining that application of the exception depends on whether the totality of the circumstances show that the officer in question faced a "now or never situation"). "[T]he critical time for determining whether exigency exists is the moment of the warrantless entry by the officers onto the premises of the defendant." *United States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir. 1984) (internal quotation marks omitted). An officer must have probable cause to believe that exigent circumstances exist, and the reasonableness of that belief is "evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Smith*, 834 F.3d at 1293 (quoting *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) (quotation omitted)).

In this case, Peterson was advised by A.S. that Shema had assaulted her moments before, that Shema was still in the home, as were the children, and that she was concerned for them. When Peterson arrived at the Shema residence, he saw that the pedestrian door to the home was open, the family dog was in the street, and Shema pacing and talking on the phone. The children did not appear to be in

31

danger but were in the back of the house, where they first were visible but then retreated.  After his entry he told the children to go to the neighbor's house and they appeared scared, but that was both after the agents' entry and might have been in response to his directive to them to go to the neighbor's house.

Nonetheless, these circumstances gave Peterson probable cause to enter the home to make sure that the children were safe.  A.S. described a violent encounter with her husband from which she fled.  She was fearful for her children, who she had left in the home as she fled from her husband following the violent encounter. It is true that Peterson waited to get his gear and for Field's arrival, but those actions neither added to nor subtracted from the exigency because Peterson reasonably believed that he should get his equipment and have another officer with him.  That Peterson first asked Shema what was going on and did not immediately go to the children, is of no constitutional moment, since probable cause is viewed from the time of entry, not after.  The evidence reasonably established that the children were not interacting with Shema, who was animatedly on the phone, nor was he interacting with them.  The children had retreated from Peterson's view before he entered.   Shema was in between Peterson and the children.   Under these circumstances, Peterson's warrantless entry was reasonable.  As a result, Shema's statements were not tainted by an unlawful entry.

**B.    April 14 statement**

The Court concludes that Shema's April 14 statements were voluntarily obtained.  The Court acknowledges the ambiguity in Peterson's advice that no consequences would attend to him if he chose to participate in the interview or did not.  But that is different than the situation in other cases where the police's statement was directed not at the fact of interview but the statements themselves, and thus were in direct conflict with *Miranda*.  *See United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991) (officers told the defendant that making a statement "would not hurt him"); *Hart*, 323 F.3d at 888-89 (officers told the defendant that "honesty wouldn't hurt him"); and *Lall*, 607 F.3d at 1283 (officers told the defendant they would not pursue charges against him).  The Court finds that Agent Peterson's (or Velez's statements) were not coercive and did not contradict or undermine the explanation of Defendant's rights under *Miranda*.  *Cf. United States v. Byrd*, No. 1:16-cr-315-02-TWT-AJB, 2017 WL 3821696, at *7 (N.D. Ga. Aug. 7, 2017), *report and recommendation adopted,* No. 1:16-cr-315-2-TWT, 2017 WL 3783029 (N.D. Ga. Aug. 31, 2017) (finding that an officer "beseeching" a defendant to tell the truth does not render a statement involuntary).  Accordingly, this case is distinguishable from *Beale*, *Hart*, and *Lall*.

Furthermore, the totality of the circumstances demonstrate that Shema's statements were voluntary.  The video demonstrates that he was anxious to tell his side of the story and answer questions.  There was nothing coercive about the agents' conduct, nor did they overbear his will.  He was presented with a waiver form and although the agents told him to review it he signed it without apparently looking at it.  The fact that the evidence does not show that Velez told him he was a criminal investigator or that he was facing criminal charges does not render his statements involuntary.  *United States v. Orr*, 819 Fed. Appx. 756, 763 (11th Cir. July 1, 2020).  Significantly, he was not told that he would not be prosecuted and in fact acknowledged that he could be charged.

Therefore, his April 14 statements are voluntary.

### C.      April 11 and August 5 statements

Shema did not challenge the government's arguments that these statements were voluntary.  Although the government bears the burden on this issue, Shema hasn't explained why any statements made on those dates should be deemed involuntarily obtained.

As a result, the Court concludes that the government has satisfied its burden that Shema's statements were voluntarily obtained.

## IV.   **CONCLUSION**

For all of the reasons stated above, the Court **RECOMMENDS** that Shema's motion to suppress statements, [Doc. 26], be **DENIED**.

The Court has now ruled upon, or recommended a ruling upon, all matters referred pursuant to Standing Order 14-02 (N.D. Ga. Aug. 15, 2014).  As a result, this matter is **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED, RECOMMENDED, and DIRECTED**, this 31st day of March, 2022.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE