# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ILIRJAN SHEMA | Criminal Action No.<br>1:21-cr-0297-SDG |

## OPINION AND ORDER

This matter is before the Court on United States Magistrate Judge Alan J. Baverman's Final Report and Recommendation (the R&R) [ECF 45], which recommends that Defendant Ilirjan Shema's motion to suppress statements [ECF 26] be denied. Shema filed an objection to the R&R [ECF 48], and the Government filed a response [ECF 49]. After careful consideration of the record, the Court **ADOPTS IN PART** and **DECLINES IN PART** the R&R. Shema's motion to suppress statements is **GRANTED IN PART** and **DENIED IN PART**.

## I. Background

Neither party objects to the R&R's factual findings and, finding no clear error,[1] the Court adopts those findings. The Court need not repeat the detailed

---

[1] Absent objection, the Court will review the R&R's findings for clear error. 28 U.S.C. § 636(b)(1)(A).

factual background provided in the R&R but, where appropriate, will refer to the R&R's factual findings.

Shema has been indicted on three counts related to an alleged assault on his wife, A.S., at a residence assigned to the United States Embassy in the Republic of Moldova, which is in the Special Maritime and Territorial Jurisdiction of the United States.[2] Shema moves to suppress incriminating statements he made to law enforcement.[3] Judge Baverman held a hearing on Shema's motion and the parties submitted post-hearing briefs.[4]  In his post-hearing brief, Shema only challenges the statements he made to law enforcement on April 10 and April 14, 2021.[5] Shema argues that his April 10 statements were tainted by the officers' unlawful entry into his home and that his April 14 statements were taken involuntarily in violation of his Fifth Amendment rights.[6]

The R&R recommends that Shema's motion be denied. The R&R found, specifically, that law enforcement did not have Shema's consent to enter his home

---

[2]  ECF 1; ECF 45, at 1.

[3]  ECF 45, at 2.

[4]  ECF 37; ECF 38.

[5]  ECF 45, at 18.

[6]  *Id.* at 17–18.

on April 10, but that exigent circumstances justified the warrantless entry.[7] As for the April 14 statement, the R&R found that the officer's assurance to Shema that there would be "no consequences" whether or not Shema chose to be interviewed was not coercive,[8] and that the totality of the circumstances demonstrated that Shema's confession was voluntary.[9] Shema timely filed an objection,[10] to which the Government responded.[11]

## II.   Discussion

The Court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). Shema objects to the R&R's findings that (1) exigent circumstances permitted the officers' warrantless entry into his home on April 10 and (2) that, under the totality of the circumstances, the statements he gave on April 14 were voluntary.[12]

---

[7]   *Id.* at 25–32.

[8]   *Id.* at 33.

[9]   *Id.* at 34.

[10]   ECF 48

[11]   ECF 49.

[12]   ECF 48, at 1.

### A.   Statements Made on April 10

The first statements at issue are those Shema made to Regional Security Officer Joshua John Peterson and Peterson's deputy, Special Agent Lucas Field, in Shema's home on April 10, 2021, the date of the alleged assault. Shema argues that these statements must be suppressed because Peterson and Field unjustifiably entered his home without a warrant.[13] The R&R agreed with Shema that he did not consent to the officers' entry, and rejected the Government's position that Shema's "monosyllabic reply" to Peterson's statement, "we are coming in," demonstrated consent.[14] The R&R concluded, however, that it was reasonable for Peterson to enter Shema's home without a warrant because he had probable cause to believe that Shema and A.S.'s children, who were still in the home, were in danger, and that this constituted an exigent circumstance.[15]

The Court agrees that Shema did not consent to Peterson and Field entering his home. When Peterson arrived at Shema's residence, the front door was open wide enough so Peterson could see and hear Shema talking loudly on the phone

---

[13]   ECF 48, at 17–20.

[14]   ECF 45, at 26–30.

[15]   *Id.* at 30–32.

and walking around the house.[16] Then, after Field arrived, Peterson announced that he and Field were "coming in" and Shema uttered something that Peterson understood to mean that Shema heard him.[17] Once inside, Peterson asked Shema "what's going on?" and Shema described what had occurred that evening, including his suspicions that A.S. was having an affair and that he had grabbed her by the neck and thrown her to the floor.[18]

Shema's monosyllabic response was not an invitation for Peterson and Field to enter his home. Nor was it a response to a request from Peterson and Field to come inside. At most, the sound was an acknowledgment of Peterson's statement that he and Field were going to enter. *See Fuqua v. Turner*, 996 F.3d 1140, 1153 (11th Cir. 2021) (failure to object to entry does not constitute valid consent to officers entering home). Neither party objected to the R&R's conclusion that Shema did not consent to Peterson and Field's entry into his home and, finding no clear error, the Court adopts it.

The Court also agrees with the R&R's conclusion that the warrantless entry was justified based on exigent circumstances. The "exigent circumstances"

---

[16]   *Id.* at 5.

[17]   *Id.*

[18]   *Id.* at 6.

exception to the warrant requirement permits warrantless entry "when there is a 'danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit.'" *Smith v. LePage*, 834 F.3d 1285, 1293 (11th Cir. 2016) (quoting *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002)). The most urgent exigent circumstance is "the need to protect or preserve life," otherwise known as the "emergency aid" exception. *United States v. Timmann*, 741 F.3d 1170, 1178 (11th Cir. 2013) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

To satisfy its burden that exigent circumstances justified warrantless entry, the Government must show that the law enforcement officer had "probable cause to believe, or an objectively reasonable belief" that someone was seriously injured or being threatened with serious injury and needed immediate assistance. *Timmann*, 741 F.3d at 1178. "The officer's subjective motivation is irrelevant." *Id.* (quoting *Stuart*, 547 U.S. at 404). The officer's reasonable belief is "evaluated by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Smith*, 834 F.3d at 1293.

Commonly, when courts find that officers had an objectively reasonable belief that someone inside a home needed immediate assistance, the circumstances

have "the indicia of an urgent, ongoing emergency, in which officers have received emergency reports of an ongoing disturbance, arrived to find a chaotic scene, and observed violent behavior, or at least evidence of violent behavior." *Timmann*, 741 F.3d at 1179. The indicia of an ongoing emergency were present here. Peterson went to Shema's home after A.S. fled to a neighbor's home, shoeless and distraught, and reported that she was assaulted and that she feared for the safety of her children.[19] After arming himself because of the volatile nature of domestic disputes,[20] Peterson arrived at a scene that could be fairly characterized as chaotic. The family dog was in the street, the front door to the house was open, and Peterson could see and hear Shema pacing and talking loudly on the phone.[21] Though Peterson could initially see the children and they did not appear to be in danger,[22] considering the totality of the circumstances, it was reasonable to believe Shema posed a threat to the physical safety of the children or to himself. The R&R correctly found that Peterson and Field's warrantless entry was justified considering the exigent circumstances. Shema's objection is overruled.

---

19 ECF 45, at 4.
20 *Id.*
21 *Id.* at 5.
22 *Id.*

### B. Statements Made on April 14

Shema also objects to the R&R's finding that the statements he gave during a video interview on April 14 with Special Agents Kenneth Velez and Natasha Diamond-Pate of the Diplomatic Security Service's Office of Special Investigations were voluntary.[23] Shema argues that his statements were not voluntary because (1) he was repeatedly told by Peterson that there would be "no consequences" if he chose to or chose not to speak with the agents;[24] (2) by contrast, he was never told that his statements were being taken as part of a criminal investigation or that Velez was a criminal investigator;[25] and (3) Velez and Peterson misled Shema about the contents of the waiver form.[26] The Court agrees with Shema.

Neither party argues that Shema was in custody during the April 14 interview, but, consistent with the Fifth Amendment, the Court must still determine whether his statements were voluntary. *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010). "[T]he issue of voluntariness must be determined by examining the totality of the circumstances" and it is the Government's burden to

---

[23] ECF 48, at 7.

[24] *Id.* at 7–14.

[25] *Id.* at 14–15.

[26] *Id.* at 15–17.

establish, by a preponderance of the evidence, that the confession was voluntary. *Id.* The focus of the voluntariness inquiry is "whether the defendant was coerced by the government into making the statement," such as "subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005).

Considering the totality of circumstances, the Court agrees that Shema's statements on April 14 were coerced and, therefore, not voluntary. In particular, the Court is persuaded that Peterson's repeated assurances to Shema that there would be "no consequences" if Shema chose to speak with the agents, when considered with Peterson and Velez's misrepresentations about the contents of the *Miranda* waiver form that Shema signed, were deceptive and undermined Shema's ability to make a free and deliberate choice to speak.

Shema relies primarily on the Eleventh Circuit opinions in *Lall* and *Hart v. Attorney General of Florida*, 323 F.3d 884, 895 (11th Cir. 2003) for the proposition that a false promise from law enforcement that statements would not be used against the defendant may render a confession involuntary. In *Lall*, prior to confessing, the defendant was explicitly told that nothing he said would be used to prosecute him. 607 F.3d at 1287. The Eleventh Circuit held that this was sufficient to render the

defendant's confession involuntary and, in doing so, discussed the unique nature of "the effect of deception in obtaining a confession." *Id.* at 1285–87. The court addressed the impact a false promise from law enforcement can have on a person's decision to confess and favorably cited a Third Circuit case emphasizing that, "given the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances." *Id.* at 1286 (quoting *United States v. Walton*, 10 F.3d 1030 (3d Cir. 1993)).

In *Hart*, the Eleventh Circuit found that the petitioner did not voluntarily waive his right to counsel because the waiver was the product of deception. 323 F.3d at 895. After signing a *Miranda* waiver, the petitioner asked to speak to a detective he knew and trusted to discuss the pros and cons of having a lawyer present during questioning. *Id.* at 894. That detective informed him that a disadvantage to having a lawyer would be that the lawyer would tell the petitioner not to answer questions and that "honesty wouldn't hurt him." *Id.* The Eleventh Circuit considered the petitioner's trust in the detective and the detective's statements, which contradicted the petitioner's *Miranda* rights, and concluded that

the petitioner "did not truly understand the nature of his right against self-incrimination or the consequences that would result from waiving it." *Id.* at 895.

The R&R distinguished *Lall* and *Hart* from the present case because the deceitful comments in those cases were directed at the incriminating statements themselves and not, as here, at the decision to give an interview at all.[27] The Court respectfully disagrees that this is a meaningful distinction. Peterson assured Shema, repeatedly, that there would be no adverse consequences *if he chose to* or chose not to be interviewed.[28] If Peterson's assurance had been limited to the decision not to participate in the interview, it would not have been deceptive or inconsistent with Shema's right against self-incrimination. But Peterson went beyond that and also assured Shema that there would be no consequences if Shema *did* decide to speak with the agents. This was untrue; a consequence of giving an interview would be that incriminating statements could be used against Shema, which is exactly what the Government is trying to do here.

Moreover, as in *Hart*, Shema had a previous relationship with Peterson and likely trusted him. Peterson was Shema's supervisor, they had a friendly working relationship, Peterson made all the arrangements for Shema following the alleged

---

[27]   ECF 45, at 33.

[28]   *Id.* at 10.

assault, and he even visited Shema at his hotel following the assault to check on his well-being.[29] It is clear from Shema's willingness to speak candidly with Peterson that Shema trusted him and, therefore, would have believed Peterson's statement that there would be no consequences to Shema speaking with the agents. The nature of their relationship weighs heavily in the totality of the circumstances analysis.

Peterson and Velez's misrepresentations about the *Miranda* waiver that Shema signed on April 14 were similarly deceptive. Before the interview began, Velez told Shema that the interview was voluntary, told him that he could decline to answer any question, and requested that Shema tell them the truth.[30] Velez then asked Shema to sign a "standard form" that "basically summarizes" what he had said and Peterson told Shema to read the form "for a second" but that "everything that they told you is exactly what [the form] says."[31] It was untrue that the *Miranda* waiver form was either a summary of or identical to what Velez had told Shema: Beyond stating that the interview was voluntary, the form also noted that the interviewee could request a representative for the interview and that any

---

[29] *Id.* at 3–4, 8–9.

[30] ECF 45, at 10.

[31] *Id.* at 11.

statement made could be used as evidence against the interviewee in a future criminal proceeding.[32] Indeed, at no point was Shema advised that there could be a criminal consequence for his statements during the interview.

As the Government correctly notes,[33] Shema was not in custody during the April 14 interview and so the agents were not required to obtain a *Miranda* waiver before asking him questions in the first place. Even so, by presenting the waiver as a standard form that merely requested consent for the interview, Velez and Peterson obscured the critical components of the document—that Shema was giving up his right to counsel and that anything he said could be used against him in a criminal proceeding.[34] Had they accurately explained the waiver form or encouraged Shema to read it for more than "a second," he would have understood the true nature of the interview, the nature of his right against self-incrimination, and the consequences of going forward with the interview. *See United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (telling the defendant that signing a *Miranda* waiver form would not hurt him was misleading concerning the consequences of giving up the right to remain silent); *Lall*, 607 F.3d at 1287

---

[32] *Id.* at 12.
[33] ECF 49, at 17.
[34] ECF 45, at 11–12.

(misleading statement that undermined previously given *Miranda* warnings factored into totality of circumstances for voluntariness inquiry). In fact, had the agents said nothing at all about the contents of the *Miranda* form they would have been better off than affirmatively misleading Shema about what he was signing.

Moreover, the Government's observation that Shema knew he could ultimately be held criminally responsible for the alleged assault on his wife is unremarkable and does not mitigate the fact that Shema was affirmatively misled about the potential consequences for speaking with agents. Nor does Shema's eagerness to tell his story outweigh the misleading statements made by Peterson and Velez under the totality of the circumstances.

The Court finds that the Government has failed to carry its burden to show that Shema's statements to law enforcement on April 14 were voluntary.

### III. Conclusion

Having reviewed *de novo* the portions of the R&R to which Shema objected and the remainder of the R&R for clear error, the Court **OVERRULES IN PART** and **SUSTAINS IN PART** Shema's objections. The Court **ADOPTS IN PART** and **DECLINES IN PART** the R&R and **GRANTS IN PART** Shema's motion to suppress. The statements Shema made to law enforcement during the video interview on April 14, 2021, are suppressed for trial.

**SO ORDERED** this 23rd day of June, 2022.

_____
Steven D. Grimberg
United States District Court Judge